I believe it is Ms. McAlmont going first. You're representing Mr. Bailey. When you're ready. That's correct. Thank you and may it please the court. My name is Virginia McAlmont and it is my privilege to represent Omar Bailey. Mr. Bailey is a bisexual man from Jamaica, a place once dubbed the most homophobic on earth. In rejecting Mr. Bailey's claims, requests for asylum, withholding of removal and relief under the Convention Against Torture, the agency erred. And we discussed various errors and abuses of discretion that the agency made here in our briefing and I'm of course happy to answer questions from your honors about any of the arguments we've raised. But I'd like to focus today on one error that was so fundamental that it rendered the entirety of Mr. Bailey's proceedings before the agency unfair and that alone necessitates the granting of this petition and the remand for new proceedings before the agency. And that's the failure of the agency to identify and appropriately deal with indicia that Mr. Bailey was not competent at his individual hearings. Before I talk about the nature of the indicia of incompetence, I'd like to mention something else that's clear from the record, which is that there is an obvious possible source for Mr. Bailey's potential incompetence. In 2016, Mr. Bailey was shot in the head at close range in Jamaica. That was less than two years before his individual hearings. And as the court undoubtedly knows from reading the record and the government's briefing, in a case where the immigration judge and the agency disputed many aspects of Mr. Bailey's testimony, this is one thing that the court did not find not to be credible. And no reasonable adjudicator could have. In addition to Mr. Bailey's own testimony on that point and the testimony of his witnesses, there's a police report in the administrative record and also perhaps most critically, there's an exchange with the immigration judge in which Mr. Bailey showed the judge the scars on his head. So for all of those reasons, there is a clear and obvious source for Mr. Bailey's potential incompetence that should have clued the court in to make a further inquiry under matter of MAM once Mr. Bailey became incompetent. So my question is, I read your brief and I had kind of a picture in my mind as to what the hearing transcript would look like. I was expecting, you know, just all sorts of rambling incoherence on the petitioner's part in his testimony. But then when I read through the I didn't see really any indication just in terms of the, at least on a cold record, that the IJ should have been alerted to the fact that this person in front of me, he doesn't even know, you know, what the nature of the proceedings are or what's going on. He seemed quite coherent, quite able to answer the questions. There was maybe, I can think of two passages where yes, he was a little bit rambling and incoherent, but it was because he was being pressed on inconsistencies in his testimony with other evidence. And it could well be that he was just struggling to try to keep the story together. So help me focus on what you think were the most glaring signs and just in terms of the testimony itself. Because as I said, looking at the transcripts as a whole, I did not come away with the impression you left in your briefs at all. Yes, Your Honor. And this is one of those funny examples where I actually think the is helpful to us. So it was the immigration judge who initially described Mr. Bailey's testimony as non-responsive, rambling, and unintelligible. And that's something that the Board of Immigration Appeals also said. And so I think that characterization that the immigration judge made based on the live testimony is important here. I think another point that I would make is just that it's a little bit hard to say what Mr. Bailey might have said if he had been asked some of the questions that this court has previously said can get at the question of competency. So, you know, you mentioned, Your Honor, mentioned that he, you know, seemed to have, I forget exactly what you said, but an understanding of what was going on or something to that effect. Respectfully, Your Honor, I don't think the immigration judge undertook the sort of robust back and forth on those points that would reveal whether Mr. Bailey was oriented to what was happening and was able to provide testimony in his own defense. Can I jump in? As I said, your argument is that even though, obviously, Mr. Bailey himself didn't raise the issue of his competency, obviously didn't have a lawyer there who could flag that, so the I.J. was supposed to pick up just on his or her own, I can't remember who the I.J. was, just from watching the testimony that there just should have been red flags flashing and the I.J. should have immediately zeroed in, like, this person is just not, he's not right, and I need to explore this further. And I guess that's what I'm saying. There really wasn't that, in my view, but help me if you think there's something I haven't focused on. There just wasn't that overall impression of total incoherence where a judge unprompted should have realized, that was my impression, that the judge unprompted should have realized, I really need to delve into this because there's just something, you know, greatly amiss here with this petitioner. Yes, Your Honor. In addition to Mr. Bailey's self-presentation, there was also the explicit testimony that he provided about his treatment in detention. So, this came at the end of his second individual hearing. He was asking for leniency, and almost as an aside, he mentioned that he had been to see doctors in detention who on more than one occasion had recommended that he see a psychologist because of mental health symptoms he was exhibiting. And at that point, the immigration judge stopped and did a little bit of a back and forth, but nothing like what we would expect to see a robust competency determination look like under a matter of MAM. And I think that testimony- It also occurred after two full hearings with the IJ, and had a lot of opportunity to interact with Mr. Bailey, and had not come away with the impression that he had a mental incapacity. And so, wouldn't that suggest that the more limited inquiry that was done was sufficient here? Respectfully, Your Honor, I don't think it was. I think under the board's decisions in this court's case law, interpreting the agency, or directing the agency to follow its standards, issues related to incompetency can show up at any time. And people who are incompetent might be so for different reasons. And that's one of the reasons I flagged the significance of the fact that it's undisputed that Mr. Bailey was shot in the head. Because it's hard to say how Mr. Bailey was incompetent on this record if he was, because there just isn't the sort of medical evidence that you'd expect. That medical evidence, that testimony he provided about having seen a doctor in the detention facility, respectfully, I think that should have triggered the government to produce those records under Calderon-Rodriguez and a matter of MAM itself. And the government didn't do so here. And the immigration judge satisfied himself with a very brief back and forth with the person who was arguably incompetent. And that just isn't sufficient, especially when we would expect there to be some information that could be gleaned from requiring the production of those medical records. And then if necessary... The medical records that would be helpful were never generated, because according to your client, he did not go and see the psychologist, right? Your Honor, so the medical records I was referring to there are the medical records of the people who he said saw him and recommended that he see a psychologist. I would expect there to be medical records from that doctor that would say, this is what I'm seeing and why I'm suggesting that Mr. Bailey go see a psychologist. Your Honor is correct that there wouldn't be records from the psychologist, him or herself, because Mr. Bailey said, I'm not mad and decided not to do that. But as to the first set of doctors, you would expect there to be some sort of records that would shed light on what the medical... But I think your client told the IJ what the nature of the interaction with the regular medical doctor was. He was having trouble sleeping and was talking in his sleep, or at least that was what was being reported to him. And that was the basis, I think your own client said to the IJ, that was the basis on which the doctor, the medical doctor had said, well, maybe you need to see a psychologist, right? Your Honor, I do think that there's an issue with relying on someone who is potentially incompetent under the matter of MAM standards self-report about what the doctor told him, especially when it's clear from his own testimony that he didn't believe that he was, as he said, mad. And so I think his report about what the doctor said and why the doctor thinks what he apparently thought isn't a replacement for the production and the review of those medical records that would actually show what the doctor in the detention facility thought. And I will also say, the immigration judge did sort of discredit or downplay what Mr. Bailey said as being trouble sleeping. Can I ask you about what do we know precisely about the nature of the head wound when he was shot in the head? I mean, there are various ways to be injured by a shot in the head. What do we know about that shot in the head? Very little, your Honor. So there's Mr. Bailey's testimony about being hospitalized for some period of time that he was taken to the emergency room and treated. Do we know, for example, whether the bullet penetrated the skull? I mean, I kept trying to figure out shot in the head. What does that mean? I don't know, your Honor. And I do think that those sorts of questions are precisely the questions that the court should have undertaken a further inquiry under matter of MAM to ascertain. So the extent of the wound, whether it caused these competence issues, whether Mr. Bailey was competent, that's what should have been done under matter of MAM and what the court failed to do in this instance. And to return to the point, if I may, about downplaying this as trouble sleeping, you know, again, as Judge Watford said, it's hard to do this on a cold record. But as I read that, I actually thought about some of what Mr. Bailey described to me sounded consistent with, I'm not a psychologist, so now I'm just speculating, but sounded consistent to me with PTSD. So he was talking about having trouble sleeping. And if you look closely at the testimony provided there, what he's saying is that it's really hard to get shot in the head. I'm really afraid because I got shot in the head. I don't want to get shot again. They told me I needed to go to mental, is what he said. And again, you know, excusing the fact that he was an arguably incompetent person who was doing his best at a hearing at which he wasn't represented, I think that's sufficient to put the immigration judge on notice that some kind of further inquiry under matter of MAM was required, and that the agency abused its discretion in failing to conduct that inquiry here. Okay. Do you want to have... Do you want to say anything about the adverse credibility finding on the assumption that there was no error with respect to competency? I think he's in trouble. If he's competent, I think he's in trouble on the adverse credibility finding. Thank you, Your Honor. Yes. So there's two additional issues that we raised. One is with respect to the adverse credibility finding not being supported by substantial evidence. There, I think there's the competency question comes back in again, because this court has previously said in Margarian that an adverse credibility finding that's based on testimony that could also have been problematic because of an unexplored competency issue is not supported by substantial evidence. So there's that issue. And then there's also the fact that when you parse what the immigration judge was really relying on here, the adverse credibility determination is based on omissions and lack of detail and other things that in all kinds of different ways and all kinds of different cases, this court has previously said it may not be sufficient to support an adverse credibility determination. In addition to those sets of issues with the adverse credibility finding, I would also say that the agency in this case should have and did not look separately at whether Mr. Bailey had established a fear of future persecution. Everything that the agency did here was based on its finding that he was not credible with respect to past persecution. So I think that is an independent ground if this court were to conclude that Mr. Bailey was competent on which and should remand to the agency for new proceedings. And then finally, we raise... Can I ask you a question about the scope of the adverse credibility determination? You read the record as having, or you read the IJ's ruling as confining the adverse credibility determination. You sort of narrow it down. And I guess I thought maybe the record was just as susceptible to reading the adverse credibility determination as going to even whether your client was in fact bisexual. Can you help me understand how you read the record on that point? Sure. I think that reading the record as a whole, including various comments that the immigration judge made at the hearing, I think that the picture that emerges is that the court really didn't credit Mr. Bailey's allegations related to nexus. So the court doesn't say explicitly at any point, yes, you're bisexual. And I don't find that you're credible that you will be harmed because of your sexuality. But throughout both the individual hearings and in the decisions that the agency issued here, I think a fair reading of the record is to say that the agency was crediting that Mr. Bailey was bisexual and was just concerned about the nexus with his fear of harm. Okay. Let's hear from the government and you've got some time to save. You've saved some time. Thank you, Your Honor. Mr. Lawrence. Thank you, Your Honor. And may it please the attorney general. This court should deny in part and dismiss in part this petition for review because the agency's adverse credibility determination is supported by substantial evidence and the issue of mental competency has not been properly exhausted. We go back to the time that the immigration judge made a decision on this mental competency, which was discussed in the last part of the argument. And even though Bailey obtained counsel for purposes of this board, his counsel determined that mental competency was not an issue he wanted to pursue. And he wrote an 18-page brief only addressing the adverse credibility determination. He waived the issue of mental competency. Oh, but the BIA has this footnote at the end of its decision where they address the issue of competency and seem to resolve it on the merits in your, in the government's favor. But if normally with exhaustion rules, if the decision maker below decides the issue on the merits that we don't rely on exhaustion at that point. That's correct, Your Honor. I guess the disagreement that we have is whether or not the agency did decide that in that one sentence in the footnote where it says the immigration judge stated in his decision that he had no bona fide doubt about the respondent's ability to represent himself in proceedings. And it says the respondent who is now represented by counsel has not submitted any evidence regarding a lack of competency or raised a competency issue on appeal, nor is there anything in the record that would cause us to question the respondent's competency. So that suggests that the BIA examined the record and said it did not present indicia of incompetence. So that issue has been decided and is therefore properly before us. Well, Your Honor, we respectfully disagree because really the only thing that the board said there was that they looked at the record and they didn't find anything to question Mr. Bailey's competency, but we don't think that one sentence. I mean, she's claiming that there were indicia of incompetency in the inquiry that had to be made under MAM. And I'll address that, but I just wanted to assert our exhaustion argument because we don't believe that that one sentence serves as a jurisdictional springboard to raise all these different issues about matter of MAM that were not addressed below. You know, so based on that one sentence, petitioner has now come up with a 17-page argument regarding mental competency. We don't think that that has been exhausted to that extent. But nevertheless, I don't think it matters from a decision-making perspective. It's just whether it's jurisdictional or not, because we believe that it's clear that the record shows that Mr. Bailey is mentally competent to proceed in these proceedings. Matter of MAM has a specific test for determining whether a non-citizen is competent to participate in proceedings, and that's whether he has a rational and factual understanding of the nature and the object of proceedings and has a opportunity to examine and present evidence and cross-examine witnesses. The record reflects that Mr. Bailey meets that test of mental competency to proceed in proceedings. I note that there were three hearings, I think one of the judges raised this earlier on the panel, that there were three hearings before where the immigration judge had an opportunity to observe Mr. Bailey in December 2017, March 2018, and May 2018. We note that the Department of Homeland Security did not produce any documents regarding mental incompetency, although they had an obligation to do so. So we can presume that if there were documents, in the absence of any other evidence, we could presume that if there were documents showing indicia of mental incompetency, they would have produced. No documents were produced. And on top of that, Mr. Bailey denied having any health problems, both at page 117 of the record, where at the beginning of the proceedings he denied having any health problems, including mental health, and then also later when he said that he was not mad, as counsel indicated earlier. But Mr. Bailey showed all indicia that he understood what he advised the immigration judge at the December hearing that he was awaiting a police report to submit as evidence. At the March hearing, he advised the immigration judge that he had two witnesses that he wanted to present, and that he had previously requested medical records from Jamaica. On top of that, at the May hearing, he examined two witnesses, the ones that he said he would present. He also submitted letters from them on his behalf, an asylum application, and country conditions evidence. These are all indications under matter of man that he had a rational and factual understanding of the nature of proceedings, that he had a reasonable opportunity to examine, present evidence, and cross-examine witnesses. So, as Judge Collins said earlier, it wasn't until the very end of proceedings that there was some indicia where he indicated that somebody recommended that he go see a psychologist. So, the immigration judge appropriately followed up on those points by asking him questions about whether or not there was any diagnosis, or whether he went to see the psychologist, what happened. And all we learned about was that he got some sleeping pills for having trouble sleeping and talking to himself in his sleep. None of these were particularly concerning, particularly when the immigration judge had the opportunity to in three prior hearings, and saw his entire presentation throughout those hearings, and came to the conclusion that there was no bona fide doubt that he had that he was mentally competent to represent himself in these proceedings. So, we believe that there's no abuse of discretion on that point, and I think as Judge Fletcher indicated, if we do come to the conclusion that Mr. Bailey was competent, or that there was no error here with respect to the competency findings, Mr. Bailey is in trouble with respect to the adverse credibility determination. One more question before you move on to the adverse credibility determination. Of course. Just about the gunshot wound. Judge Fletcher, in questioning and opposing counsel, was asking, what do we know about that? And it sounds like we know relatively little. Shouldn't that have been at least one additional area at the very end of the hearing when the IJ was trying to explore potential competency issues? One more area where the judge should have gotten more information from Mr. Bailey? I don't think so. During my opposing counsel's presentation, I was looking for a reference in the brief and in the record that shows that at one point, Mr. Bailey said that the bullet missed him. In another point, he says that he had a gunshot wound. This wasn't an inconsistency that the board relied upon, but it was in the record where he said something to the effect that the bullet missed him. Maybe he meant that it only scathed him. I don't know what he meant. But that it missed his brain? I don't know. But to answer your question, Judge Wofford, I don't think that required any more questions regarding the gunshot wound when, again, he had the opportunity to observe Bailey over three hearings and just did not find that this was an individual who had trouble representing himself. Of course, it wouldn't have been an error for the immigration judge had he asked those questions. But by the same token, it's not an error to ask those questions. And I agree with you, Your Honor, Judge Wofford, about the concept of... I lost my train of thought there. Let's see. Are you moving to the adverse credibility determination now? Well, I was about to, but what I wanted to point out was, as far as other indicia of incompetency, you said earlier that you looked at the record and after reading Petitioner's brief, you were expecting to find a very rambling, incoherent set of testimony. And we agree with you that there were certainly two or three examples of incoherent or rambling responses, but those were all, or both are all, with respect to when he was being pressed on inconsistencies and omissions. They were not signs of indicia. It's very similar to the court's decision that stressed, if I'm pronouncing that correct, where this was considered an appropriate finding with respect to adverse credibility because there were so many rambling or incoherent responses. But we disagree that this was something that should have alerted the immigration judge at an early stage that, oh, we must do further inquiry under a matter of mail. But yes, if there's any other questions on the competency issue, again, we don't think it was exhaustive, but even if it was exhaustive, we don't think there's evidence of a mental competence issue where there was an abuse of discretion by the agency. But further, on the adverse credibility claim, we think it's pretty significant. There's substantial evidence in the record supporting adverse credibility, particularly on this whole between the asylum application, the asylum interview, and the immigration judge testimony. Things get embellished as we go along. First, in the asylum application, there's no description of what the assailant may have said at the 2016 shooting. Then, at the asylum interview, the asylum officer decides to press him on that, what was said, exactly what was said at that time. Mr. Bailey only responds, he said, get up and don't move. And that's at page 601 of the record. Then, all of a sudden, before the immigration judge, Mr. Bailey enhances his claim by saying, oh, at that time, he also called me batty boy, a gay slur in Jamaica. And that's at page 182 and 183. So, the board reasonably relied on these instances to find that this was an inconsistency or omission with respect to what he said at the hearing as compared to what he said at the asylum interview and in his asylum application. Similarly, the immigration judge gave him plenty of time to explain these inconsistencies and was not satisfied with his responses. Similarly, at the asylum interview, he said that he was never threatened or harmed for being bisexual. He said that not directly. But then, during the immigration judge testimony, we have the fact that he was stabbed in 1998, he claimed, all of a sudden, in 2013 as well. And then, accosted in 2015. And then, the gunshot wound in 2016. So, here, again, is the substantial evidence in the record supporting the average credibility determination. And there's also substantial evidence with the board's determinations on the witnesses as well. And the inconsistencies surrounding their testimony. I know that, let's see. Can I ask you a question, actually, about the cat claim? So, the CIJ just said, well, I found you not credible. That's the end of it. I don't need to even examine, I gather, the country conditions evidence. And that does seem to be in some what our cases say normally needs to happen. The board then steps in to try to fix that by reviewing the country conditions evidence itself and declares that, well, we looked at it and there's nothing here that supports the cat claim. And I think your opponent argues that the board really is not permitted to make that kind of factual finding in the first instance. And I was hoping you could at least address that point. Sure. And part of this issue goes to your question that you raised with opposing counsel earlier about whether or not, in fact, the immigration judge believed he was bisexual in the first place. And I'll try to answer both these questions at the same time. The immigration judge, when he determined at page 77 of the record that there was a complete lack of credible testimony, that means that he didn't believe anything that Mr. Bailey was saying. That includes whether he didn't say it specifically, but by saying that there was a complete lack of credible testimony, he didn't believe Mr. Bailey at all. And that includes whether his claim that he was a bisexual or homosexual in Jamaica. But the immigration judge also claimed at page 63 of the record that he reviewed all the evidence in the case. That includes the country conditions. So what he was saying at page 77, when he said that Mr. Bailey couldn't possibly meet his burden, he was saying for two reasons. One, because of the adverse credibility determination that he previously found with respect to all of other claims, that he couldn't meet his burden on getting cat protection. And two, because even if you look at the country conditions records, it's all about homophobia and persecution of gays and bisexuals in Jamaica, but he hasn't even proven that point that he's a member of that group that all this country conditions evidence relates to. So the board picked up on that. Number one, we think that the immigration judge did look at the country conditions evidence. He said he did at page 63 of the record. And the reason why he couldn't meet his burdens, both because the adverse credibility determination, which partially applies to the cat claim, but also because the information, the country conditions evidence just didn't help him because there was no, as we argued in our brief, there was no particularized threat regarding Mr. Bailey. And it was all about homophobia in Jamaica, and he hadn't even proven that he was a member of that group. And I think that's what, when the board cited to Farah versus Ashcroft, they were kind of getting at that in their parenthetical on page five of the decision, where it indicates that the cat claim depended upon some evidence in support of the asylum claim. And the evidence that was necessary for the cat claim was the very fact of his identity as a bisexual in Jamaica. So if that's not to be believed, then all the country conditions evidence in the world is not going to help Mr. Bailey. So we don't think that the board engaged in a permissible fact finding. It was simply reiterating the points made by the immigration judge in a more clear way. Okay. Any further questions from the bench? Okay. Thank you very much. Back to you, Ms. McCollum. Let's put two minutes on the clock. Thank you, Your Honor. Just a few quick points to highlight. So one, to go back to the point about when the indicia of incompetence arose at the end of the second hearing. Again, I think the board's decision in a matter of MAM and in other cases is clear that indicia of incompetence can arise at any time and they can be subtle. And I think in this case, it actually wasn't subtle because even setting aside Mr. Bailey's self-presentation, there was this issue of the treatment that he had received or not received in detention that should have been explored further by the immigration judge. The agency's failure to require that was an abuse of discretion. In addition, on opposing counsel's point at the end there about there's this general adverse credibility finding. As this court knows, trial judges, immigration judges included, are free to different aspects of immigrant's testimony. And in this case, I think to say that the immigration judge's finding on that point extends all the way to Mr. Bailey's bisexuality is to overread the record. Again, I think reading the record as a whole, I think it does appear that the agency credited that Mr. Bailey was bisexual. No, no, no. This is pretty strong language. The court has very grave and serious concerns about credibility of the three witnesses in this case. The court finds that all three of these witnesses have testified incredibly. None of them have testified credibly in this case. The respondent has failed to provide credible testimony in his own case. This is, sounds like he just didn't believe anything he said. Respectfully, your honor, when you look at, for example, at the end of the first individual hearing when the immigration judge gave Mr. Bailey the Real ID Act warning, what he specifically talked about not being corroborated was the nexus issue that Mr. Bailey's harm was because of his sexual orientation. And in the same way that, you know, I just, I think a general statement like that to say that that extends to every aspect of the testimony that Mr. Bailey presented over multiple days, you know, under that argument, that would extend then to the testimony about the gunshot wound as well. And as for the reasons I previously discussed, no reasonable adjudicator could have found that Mr. Bailey was not credible on that point. I recognize I'm out of time. So okay. Well, thank, thank you very much. I think I'm right, Ms. McCormick, that you're doing this as part of our pro bono program. Is that correct? Yes. Well, on behalf of our court and particularly on behalf of this panel, I'd like to thank you for the excellent work you've done here. You and others who participate in this program make our job much easier by your highly professional work and putting, putting forward all the best arguments that you can. And we thank you and but you're paid. So it's a different proposition, but thank both sides for their very helpful arguments in this case. Bailey versus Garland submitted.
judges: W. Fletcher, Watford, Collins